THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JULIO CANTU, Defendant-Appellant.

First District (1st Division)    No. 78-1687

Opinion filed December 10, 1979.

Michael A. Unger, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Rimas F. Cernius, and Gerald E. Nora, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE McGLOON delivered the opinion of the court:

Defendant, Julio Cantu, was charged by information with the offenses of attempt murder, armed violence, aggravated battery with a deadly weapon, aggravated battery causing great bodily harm, aggravated battery causing permanent disability and aggravated battery causing permanent disfigurement. After a bench trial, defendant was found guilty of aggravated battery with a deadly weapon, aggravated battery causing great bodily harm and aggravated battery causing permanent disfigurement, and sentenced to three years in the penitentiary. Defendant appeals.

On appeal defendant contends that (1) the trial court erred by allowing the main defense witness Angelita Ledesma to invoke the constitutional right against self-incrimination after the witness had waived that right by testifying to incriminating facts; (2) the trial court overstepped the bounds of neutrality by inducing the witness to invoke her right; (3) the trial court further erred when it denied the motion for a new trial by refusing to receive a written, sworn statement of Angelita Ledesma; (4) the trial court erred on denying the motion for a new trial by not hearing the testimony of Angelita Ledesma; and (5) the State failed to produce evidence of guilt beyond a reasonable doubt.

We reverse and remand.

On February 7, 1977, Luis Hernandez received a gunshot wound to his left eye while patronizing the Rainbow Lounge. One of several shots fired from outside the lounge struck him in the left eye, causing him to lose that eye. A glass eye was inserted, but the bullet remains behind it.

The State's witness Juan Barriga testified that on the night of the shooting he went to the Rainbow Lounge with three friends. They left the tavern at approximately 1:55 a.m. At that time he saw defendant, Julio

Cantu, leave the lounge with a woman, later identified as Angelita Ledesma. Barriga testified that he saw the woman and defendant walk to a car which was parked approximately 50 feet away. The woman entered the car, got a gun, and fired two shots outside the car into the air. He testified that the defendant entered the car on the driver's side at the time the shots were fired, took the gun from the woman, and fired the gun four times in the direction of the lounge. Upon questioning by the court, Barriga testified that he fell to the ground face down when the defendant pointed the gun and was therefore unable to see anything after the shots were fired.

The testimony of the next State's witness, Officer Rene Hidalgo, revealed that Officers Hidalgo and Jesse Camarena curbed a vehicle occupied by the defendant and Angelita Ledesma. The officers transported the occupants to different police stations. Ms. Ledesma exercised her right to remain silent while en route to the station, but later spoke to the officers regarding the events after being advised of her rights.

Ms. Ledesma directed Officers Hidalgo and Camarena to a vicinity near a bridge to search for the gun. After an unsuccessful search, Ms. Ledesma then directed the officers to 8252 South Buffalo. She led them inside a bedroom where Officer Hidalgo found a pistol and ammunition clip hidden under a mattress. Officer Hidalgo testified that he found three bullets inside the clip, and that the clip could contain six or seven live rounds. One bullet could also be placed in the chamber.

Officer Jesse Camarena testified to the same sequence of events as Officer Hidalgo. He also testified that a spent cartridge was found in one of Ms. Ledesma's pockets, but none was found on the defendant. Further testimony revealed that Angelita Ledesma spoke freely about the incidents which occurred that evening, and that, had the officers wanted to, they could have gotten a written statement from her.

The defense called Angelita Ledesma as its first witness. Ms. Ledesma stated that as she and the defendant left the Rainbow Lounge at 1:45 a.m. a group of men surrounded them and began speaking. She then testified that she went past the men, walked to the car, took a gun out of the glove compartment, and rolled down the window. At this time, the court warned the witness of the potentially incriminating nature of her testimony and inquired as to her ability to hire an attorney. The court thereafter appointed two assistant public defenders to consult with the witness.

Ms. Ledesma resumed the stand approximately one-half hour later at which time her appointed attorneys made a motion to withdraw the witness based on the right against self-incrimination. Defense counsel objected on the ground that the witness had waived her right to remain silent.

The following exchange then took place:

"THE COURT: Do you want to tell us, you have talked to your lawyers, you wish to continue to be examined as a witness by the defense?

THE WITNESS: Yes.

ASSISTANT PUBLIC DEFENDER I: Well, your Honor, for the record then we would still strongly advise our client to remain silent.

ASSISTANT PUBLIC DEFENDER II: We would like the record to emphatically reflect any testimony she gives is contrary to our advice.

THE COURT: Ms. Witness, you just heard what your lawyer said, did you?

You can't just shake your head. You have to tell me.

THE WITNESS: Yes.

THE COURT: You did. And you understand they are telling you, advising you not to say any more. Do you understand that?

THE WITNESS: Yes.

THE COURT: And understanding that, what is your pleasure?

THE WITNESS: Well, I just take silence now. I just take silence for now.

THE COURT: You want to stay silent for now; is that what you are saying? You don't want to testify on behalf of the defendant. Is that what you are telling us? He wants to ask you some questions. Go ahead.

DEFENSE COUNSEL: Q. Angelita, Ms. Ledesma, you say you took the gun out of the glove compartment?

THE WITNESS: A. Yes.

THE COURT: Now, you have a right to remain silent. You understand that. You can refuse to answer on the ground that you may incriminate yourself. You can say that to any question that is asked you by anybody here. Do you understand that?

Don't just shake your head. You must answer.

THE WITNESS: Yes.

* * *

DEFENSE COUNSEL: Q. After you got the gun from the glove compartment, what did you do?

ASSISTANT PUBLIC DEFENDER I: Your Honor, if I may remind the witness of her rights?

You understand your rights and your * * *

ASSISTANT PUBLIC DEFENDER II: You don't have to answer any question that the counsel asked you. You have a right to remain silent after each and every question that we advise you to.

DEFENSE COUNSEL: Q. You want to give a verbal yes to their questions? Do you understand?

THE WITNESS: Yes.

ASSISTANT PUBLIC DEFENDER II: Do you understand what we are telling you?

DEFENSE COUNSEL: May I propound a question now?

THE COURT: You may ask her a question.

DEFENSE COUNSEL: Q. Now, after you took the gun from the glove compartment, what did you do with it?

THE COURT: Do you want to answer that question or do you understand what your lawyer told you? You have a right to remain silent. So what is it you want to say to this question at this point?

THE WITNESS: I did fire it.

THE COURT: I didn't hear it.

THE WITNESS: I did fire the gun.

ASSISTANT STATE'S ATTORNEY: Judge, I am sorry. I didn't hear that answer.

THE COURT: Read it back, Reporter.

(Record read)

ASSISTANT PUBLIC DEFENDER I: I would like the record to also reflect when the Court asked her if she understands, she had the choice of answering counsels question or—

THE COURT: Follow our advice.

ASSISTANT PUBLIC DEFENDER I:—follow our advice that she not—she nodded yes, indicating she understood.

DEFENSE COUNSEL: She also gave a verbal response. I asked her to answer your question. She said yes.

THE COURT: Is there any question in your mind about you being advised [of] your rights? Hmm?

THE WITNESS: No.

THE COURT: Tell me what you know your rights to be at this point.

THE WITNESS: Right as if I want I can remain silent.

THE COURT: And you understand that any question that is asked you by this attorney who is talking to you or by the judge or by the State's Attorney you can just say I wish to remain silent. Do you understand that?

DEFENSE COUNSEL: Give a verbal answer, please.

THE WITNESS: Yes."

The witness then stated that she wished to hire her own attorney. The court withdrew the witness from the stand and granted the prosecution's motion to strike her testimony.

The court continued the case so as to afford Ms. Ledesma an

opportunity to confer with private counsel. During this time, however, she returned to the assistant public defenders for assistance. Two weeks later, when she returned to the stand, Ms. Ledesma stated that she wished to remain silent. The court then excused the witness.

Defendant, Julio Cantu, testified that as he and Ms. Ledesma left the Rainbow Lounge, several men confronted them, spoke to Ms. Ledesma and would not let them pass. Ms. Ledesma escaped while defendant remained, trying to protect himself. Defendant then heard several shots and the men allowed him to walk to his car. Ms. Ledesma and defendant proceeded to a restaurant. Afterwards, they drove to Ms. Ledesma's house where defendant saw her remove a pistol from her pocket and place it on a bed.

On cross-examination, defendant stated that the residence at 8252 South Buffalo now belongs to his friend Vincente Campos but that on the date in question it belonged to Ms. Ledesma. Defendant admitted owning the pistol recovered from the bed. He stated, however, that he had left the gun and six or seven cartridges at Ms. Ledesma's home three days earlier because the gun was defective.

The defendant testified that he did not see who fired the gun. He initially stated that when he entered the car, he asked Ms. Ledesma if she knew who had fired the gun. At another point, he testified that he did not learn who fired the shots until Ms. Ledesma put the gun on the bed. Further testimony revealed that defendant told the assailants that he did not have a gun, but would fight them one by one.

Defense witness Vincente Campos testified that he had been defendant's friend for 5 or 6 years. On the night in question, he drove to the Rainbow Lounge and, after parking his car, saw several men detaining defendant. He heard three or four shots, after which defendant's captors moved aside. Defendant then went to his car and drove away. Campos did not see defendant fire a gun at any time that evening.

After arguments, the trial court found the defendant guilty of aggravated battery with a deadly weapon, aggravated battery causing great bodily harm, and aggravated battery causing permanent disfigurement.

Defendant thereafter retained new counsel who filed a motion for a new trial. On arguments for a new trial, the unsuccessful attempt by prior defense counsel to call Angelita Ledesma as a witness was recounted. It was also asserted that defendant was deprived of effective assistance of counsel. As justification for a new trial, a sworn statement made by Ms. Ledesma in which she admitted firing the shots was offered. Counsel also offered to have Ms. Ledesma testify during the hearing on the motion for a new trial. The court refused both the statement and testimony, stating:

"I will deny your motion because insofar as I am concerned, whatever she said wouldn't convince this court of any reasonable doubt based on what I saw."

Defendant was then sentenced to serve three years in the penitentiary. Defendant appeals.

Defendant first argues that the trial court erred in allowing Angelita Ledesma to invoke her right to remain silent after she had, in fact, waived that right by offering incriminating testimony. Specifically, he argues that Ms. Ledesma waived her right when she testified that she removed the gun from the glove compartment and fired it.

■■ Article I, section 10 of the Illinois Constitution of 1970 and the fifth amendment of the United States Constitution guarantee a witness the right to remain silent. A witness may not be compelled to give testimony which may tend to establish criminal liability. (*People ex rel. Keith v. Keith* (1967), 38 Ill. 2d 405, 231 N.E.2d 387.) However, it is equally clear that this right is waived if the witness fails to assert it at the time questions are asked. *People v. Cooper* (1937), 366 Ill. 113, 7 N.E.2d 882; *People v. Nachowicz* (1930), 340 Ill. 480, 172 N.E. 812.

■ Once the privilege has been waived, the witness cannot refuse to answer questions regarding that act. In *Nachowicz*, the court stated:

"If the witness consents to testify to one matter tending to criminate himself he must testify in all respects relating to this matter so far as material to the issues. If he waives the privilege he does so fully in relation to that act * * *." 340 Ill. 480, 493, 172 N.E. 812, 817.

In the case at bar, Angelita Ledesma voluntarily testified about leaving the lounge with the defendant, being stopped by persons outside, going to the car, removing a gun from the glove compartment, and rolling down the window. After consulting with the assistant public defenders who were appointed to advise her of her rights and after stating she understood those rights Ms. Ledesma testified that she fired the gun.

■ We find that Angelita Ledesma waived her right to silence by testifying to these acts. By admitting that she took the gun out of the glove compartment and, after warned of her rights, stating that she fired the gun, she knowingly waived any right of silence with respect to the act of shooting.

The State contends that Angelita Ledesma did not waive her constitutional protection against self-incrimination. It is argued that the testimony sought by defense counsel, namely, that Ms. Ledesma was the only person to fire the gun, would further incriminate Ms. Ledesma by subjecting her to an increased danger of prosecution. The State maintains that such testimony opens a new realm of incrimination since Ms. Ledesma would then be subject to prosecution for the same offenses with

which defendant was charged. This, the State claims, is a sufficient ground for invoking the right to remain silent.

■ The State is correct in its contention that a witness may refuse to testify if a reasonable danger of further incrimination exists. (*Rogers v. United States* (1951), 340 U.S. 367, 95 L. Ed. 344, 71 S. Ct. 438.) However, it is difficult to conceive how further testimony could be more incriminating than that to which she already testified. Under the principles enunciated in *Nachowicz*, once the privilege is waived with respect to an act, a witness cannot withhold the details. *People v. Nachowicz* (1930), 340 Ill. 480, 172 N.E. 812.

We find that the witness waived her constitutional right by knowingly and voluntarily testifying to incriminating facts and therefore should have been permitted to testify further about the facts surrounding the shooting. For this reason Angelita Ledesma's testimony should not have been stricken. Rather, it should have remained as part of the record and been taken into consideration by the trial judge in determining the guilt or innocence of the accused.

Defendant raises other contentions of error in this appeal. However, due to our disposition, we need not consider them.

For the foregoing reasons, we reverse the judgment of the circuit court of Cook County and remand the cause for a new trial.

Judgment reversed; cause remanded for a new trial.

O'CONNOR and CAMPBELL, JJ., concur.